AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Middle District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| JORGE LUIS HERNANDEZ VILLAZON | ) | Case No. |
| | ) | **8:25MJ2295SPF** |
| | ) | |
| Defendant(s) | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ November 2020 _____ in the county of _____ in the

____ Middle ____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to commit wire fraud |

This criminal complaint is based on these facts:

See Affidavit.

☑ Continued on the attached sheet.

_____
Complainant's signature

SA Miosotis Ortiz-Rodriguez, FBI
_____
Printed name and title

Sworn to before me over the telephone or other reliable electronic means and signed by me
pursuant to Fed. R. Crim. P. 4.1 and 4(d).

Date: _6/12/2025_

_____
Judge's signature

City and state:          Tampa, FL          

SEAN P. FLYNN, U.S. Magistrate Judge
_____
Printed name and title

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Miosotis Ortiz-Rodriguez, after being duly sworn, depose and state as follows:

1. I submit this affidavit in support of a criminal complaint charging **JORGE LUIS HERNANDEZ VILLAZON** with knowingly and willfully conspiring and agreeing with other persons both known and unknown to commit wire fraud, in violation of 18 U.S.C. § 1349.

2. I am a Special Agent with the United States Federal Bureau of Investigation (FBI) and currently assigned to the Tampa District Office. I began my law enforcement career in November 2001 and have served as a Special Agent with the FBI since August 2016. I have conducted numerous criminal drug investigations of both domestic and international drug trafficking organizations involved in the manufacturing, distribution, and possession of controlled substances such as cocaine, marijuana, etc.

3. Since July 2020, I have been assigned to the Operation Panama Express Strike Force. Operation Panama Express is a federally approved Organized Crime Drug Enforcement Strike Force (OCDETF) investigation being conducted by the FBI, Drug Enforcement Administration (DEA), Homeland Security Investigations (HSI), Coast Guard Investigative Service (CGIS), and the United States Coast Guard (USCG). Investigations initiated by Operation Panama Express are prosecuted in the Middle District of Florida (Tampa Division). Special Agents assigned to

Operation Panama Express currently investigate Transnational Criminal

Organizations (TCOs) that are responsible for the transportation of various narcotics,

to include cocaine, through international waters of the Caribbean Sea and Pacific

Ocean via maritime vessels. These drug loads are smuggled to transshipment

locations for later introduction and distribution to the United States. Panama

Express agents also investigate the means these TCOs use to launder illicit proceeds

derived through drug trafficking and other organized crime.

      4.      The information contained herein is either personally known to me or

has been provided to me by other law enforcement officers with whom I have

worked on this investigation. This affidavit is submitted for the limited purpose of

establishing probable cause for the criminal charges set forth herein and, therefore,

does not contain each and every fact known to me or other law enforcement agents

concerning this investigation.

## PROBABLE CAUSE

### A. Overview of the Investigation

      5.      Since at least 2020, **HERNANDEZ VILLAZON** represented that he

worked in partnership with criminal defense teams operating in the Middle District

of Florida (MDFL), the Southern District of Florida (SDFL), and the District of

Puerto Rico (DPR). **HERNANDEZ VILLAZON** solicited drug traffickers in

Colombia and the Dominican Republic facing extradition to the United States and

demanded payments in upward of $1 million USD based on promises of sentences of

2

no more than a few years in the United States. **HERNANDEZ VILLAZON** used

coconspirators in Colombia to collect payments in Colombia and the Dominican

Republic. Payments to **HERNANDEZ VILLAZON** traveled in interstate and

foreign commerce, including payments wired from Colombia to **HERNANDEZ

VILLAZON** that were then wired to commissary accounts of cooperating

defendants (CDs) incarcerated in the Middle District of Florida. Wire

communications that furthered the scheme included those traveling in interstate and

foreign commerce to and from the Middle District of Florida. **HERNANDEZ

VILLAZON** did not provide the offered services promised to those who agreed to

pay him. The evidence against **HERNANDEZ VILLAZON** includes WhatsApp

communications, a cooperating defendant equipped with a recording device while

**HERNANDEZ VILLAZON** described the scheme, WhatsApp communications

between **HERNANDEZ VILLAZON** and coconspirators, recorded calls, jail

records, and financial records.

  6.  During interviews in 2024 of cooperating defendants, investigating

agents became aware of **HERNANDEZ VILLAZON**, a former confidential source

for the United States Government, attempting to extort high-level traffickers by

demanding significant sums of money under the guise of legal services, promising

significant reductions in those defendants' sentences, and communicating threats if

the traffickers and their families fail to pay. The total amount of money

**HERNANDEZ VILLAZON** demanded was at least $4.1 million and cooperating

defendants described making payments in the hundreds of thousands of dollars through family members and others with no services rendered. **HERNANDEZ VILLAZON** is currently serving a term of federal probation until on or about May 30, 2027, following a conviction for conspiracy to commit money laundering (18 U.S.C § 1956(h)).

7.    Since June 2024, investigators interviewed several cooperating witnesses regarding their dealings with **HERNANDEZ VILLAZON**. Six (6) of these individuals are cooperating defendants (CDs) who were extradited or self-surrendered to the United States for their involvement in cocaine smuggling. Each CD is cooperating with law enforcement in hopes of a reduced sentence.

8.    Based on my knowledge of the investigation, the fraud scheme described below followed a common pattern:

   a.  **HERNANDEZ VILLAZON** and/or Coconspirator 1 would solicit a trafficker to hire them on promises that the trafficker would get the best legal team in the United States, serve a sentence of no more than a few years despite facing charges with penalties carrying ten-year minimums and maximum terms of life imprisonment, and that the trafficker would serve a portion of his sentence in an apartment in the United States;

   b.  **HERNANDEZ VILLAZON** would control the fee and how payments would be structured. This fee would be negotiated outside of the retention agreement with the trafficker's domestic counsel;

4

c. **HERNANDEZ VILLAZON** would use coconspirators to collect cash, properties, and vehicle titles to cover the traffickers' "fees" to him. At times, payments and titles would be put in the names of third-parties;

d. **HERNANDEZ VILLAZON** offered to supply "positivos" (drug seizures) to traffickers that were distinct from information within the trafficker's personal knowledge and offered to supply informants to work with a third-party cooperator working on behalf of the traffickers. This arrangement would not be disclosed to federal prosecutors and federal law enforcement agents. At times, **HERNANDEZ VILLAZON** knew that third-party cooperation was not approved in a trafficker's case yet continued demanding payments from the trafficker and his family;

e. **HERNANDEZ VILLAZON** represented that he worked for/with the Federal Bureau of Investigation ("FBI") and Drug Enforcement Administration ("DEA"). He also obtained certification to be a paralegal that he used to meet with inmates in unrecorded attorney visits;

f. As traffickers and their families grew upset with **HERNANDEZ VILLAZON**, he would deny responsibility and shift blame to the trafficker's domestic counsel; and

g. To induce payments, **HERNANDEZ VILLAZON** made threats to

5

family members warning of the consequences for non-payment.

**B. Substantial Assistance Motions and Sentence Reductions**

9.      Section 5K1.1 of the United States Sentencing Guidelines ("5K1.1")
and Rule 35 of the Federal Rules of Criminal Procedure ("Rule 35") set forth the
procedures by which a United States District Court could reduce a federal
defendant's sentence for providing substantial assistance to the United States. In
particular, 5K1.1 authorized the United States to file a *pre-sentence* motion to reduce
the defendant's sentencing guidelines range if the defendant provided substantial
assistance in the investigation or prosecution of another person. Typically, a decrease
in a defendant's sentencing guidelines range resulted in a reduced sentence for the
defendant. Rule 35, on the other hand, authorized the United States to file a *post-
sentence* motion to reduce a defendant's sentence for providing substantial assistance
to the United States in the investigation or prosecution of another person.

10.     The United States Attorney's Office for the Middle District of Florida
(hereinafter the "USAO MDFL")—the federal prosecuting authority in the Middle
District of Florida—had the authority to determine whether a defendant provided
substantial assistance to the United States and whether to file a motion to reduce the
defendant's sentence pursuant to 5K1.1 or Rule 35. Typically, before filing a 5K1.1
or Rule 35 motion to reduce a defendant's sentence, the USAO MDFL required the
defendant to personally provide substantial assistance to the United States in its
investigation or prosecution of another person for committing a crime. Accordingly,
in the usual case, a defendant would personally provide substantial assistance to the

6

United States and, as a reward for that assistance, the USAO MDFL would file a 5K1.1 or Rule 35 motion with the United States District Court for the Middle District of Florida (hereinafter the "U.S. District Court") to reduce the defendant's sentence.

11.    With the approval of the USAO MDFL, however, a defendant could earn substantial assistance credit through the use of a third-party cooperator. Third-party cooperation was different from typical cooperation efforts because the defendant was not personally involved in providing substantial assistance to the United States. Instead, another person, referred to as the "third-party cooperator," assisted the United States on behalf of the defendant. As a general rule, a third-party cooperator was a spouse, girlfriend, boyfriend, close friend, or family member of the defendant. In exchange for substantial assistance provided by the third-party cooperator for the benefit of the defendant, the USAO MDFL would file a 5K1.1 or Rule 35 motion with the U.S. District Court to reduce the defendant's sentence.  If the USAO MDFL discovered that there was no legitimate relationship between the defendant and the third-party cooperator, the USAO MDFL would not authorize the third-party cooperation effort or give the defendant any credit for that effort.

12.    Pursuant to the USAO MDFL's policy, the third-party cooperator could not receive any personal benefit for providing substantial assistance to the United States.  For example, the United States would not pay a fee to, reduce the prison sentence of, decline to charge, or drop charges against the third-party cooperator.  Rather, the defendant received the benefit for the substantial assistance

7

provided by the third-party cooperator. Pursuant to the USAO MDFL's policy, the use of a third-party cooperator would not be authorized if the defendant or someone acting on the defendant's behalf paid or promised to pay the third-party cooperator for his assistance. If the USAO MDFL discovered that a third-party cooperator had been paid a fee or promised payment of a fee for his efforts to earn a 5K1.1 or Rule 35 sentence reduction for a particular defendant, the USAO MDFL would refuse to file a substantial assistance motion for that defendant.

13.    Without the filing of a 5K1.1 motion by the USAO MDFL, the U.S. District Court did not have the authority to depart downward from a defendant's sentencing guidelines range based on substantial assistance, and without the filing of a Rule 35 motion by the USAO MDFL, the U.S. District Court did not have the authority to reduce a defendant's sentence based on substantial assistance to the United States.

## C. Payments for Services Never Provided

14.    Each CD explained their interactions with **HERNANDEZ VILLAZON**. Some CDs never met **HERNANDEZ VILLAZON** in person but talked with him over the phone and via video calls. Between 2020 and 2024, each CD communicated with **HERNANDEZ VILLAZON** regarding legal services **HERNANDEZ VILLAZON** claimed to be able to provide towards the CD's criminal case in the United States. Often, **HERNANDEZ VILLAZON**'s "fee" was between $700,000 and $1,000,000 USD. **HERNANDEZ VILLAZON** told CDs that

8

he could receive cash, vehicles, property, and jewelry in Colombia as forms of payment. In exchange for the assets, **HERNANDEZ VILLAZON** guaranteed prison sentences of between two and four years, and told CDs they would serve much of their sentence living in an apartment similar to being on house arrest.

15.    In 2024, **HERNANDEZ VILLAZON** met with CD-1 and law enforcement recorded the meeting. In summary, translated from Spanish to English, **HERNANDEZ VILLAZON** described that he has several informants in Colombia who could provide information about drug smuggling ventures. To circumvent restrictions on the use of third-party cooperators at U.S. Attorney's Offices, **HERNANDEZ VILLAZON** offered to have his informants provide information to approved third-party cooperators so that the information could be falsely presented to federal law enforcement as originating from the approved third-party cooperator.

16.    During the course of this investigation, trained FBI linguists reviewed jail calls between **HERNANDEZ VILLAZON** and two CDs: CD-2 and CD-3. Both CDs were prosecuted in the Middle District of Florida, and both were incarcerated in the Middle District of Florida at the times of these calls. Prior to their extraditions to the United States, **HERNANDEZ VILLAZON** solicited $1 million USD from each with the promise that they would serve short prison sentences. A Spanish-speaking agent reviewed each of the calls. Summaries of the calls are based on the agents' training, experience, and knowledge of the investigation:

   a.  On March 22, 2022, CD-3 spoke with **HERNANDEZ VILLAZON**. During the call, CD-3 asked **HERNANDEZ VILLAZON** not to stress

9

about CD's payments. CD-3 also asked **HERNANDEZ VILLAZON** if he should ask for his mother's house to guarantee his payments. CD-3 told **HERNANDEZ VILLAZON** that he was almost 70% complete with the payments;

b. Later that evening on March 22, 2022, CD-3 and **HERNANDEZ VILLAZON** spoke again. During this call, **HERNANDEZ VILLAZON** told CD-3 that he did not work with DEA, but he worked with FBI. CD-3 explained to **HERNANDEZ VILLAZON** that he talked with his brother about making payments to Coconspirator 1 and **HERNANDEZ VILLAZON**. **HERNANDEZ VILLAZON** relayed that he told Coconspirator 1 not to worry because he knew that CD-3's brother had a Toyota and **HERNANDEZ VILLAZON** could ask for the car.

c. During a call on March 29, 2022, **HERNANDEZ VILLAZON** asked if CD-3 received the "good news." **HERNANDEZ VILLAZON** informed CD-3 that "they" were going to give CD-3 "time served."

d. On May 2, 2022, a CD-2 spoke with **HERNANDEZ VILLAZON**. During this call, **HERNANDEZ VILLAZON** advised CD-2 that CD-2's attorney and investigator (retired DEA Agent) were traveling to Colombia on Monday. **HERNANDEZ VILLAZON** asked what the CD-2's attorney should do "to get a payment," to which CD-2 replied that he would check on it. **HERNANDEZ VILLAZON** represented that he and "his people" do a good job and are the best team for this type of work.

e. During a call on May 4, 2022, CD-2 spoke with **HERNANDEZ VILLAZON** and agreed on "one million" as the contract amount for the investigator. **HERNANDEZ VILLAZON** confirmed and instructed CD-2 to pay "150" because CD-2 still owed "300." **HERNANDEZ VILLAZON** promised to "delay" the rest.

f. On May 6, 2022, CD-2 spoke with **HERNANDEZ VILLAZON**. During the call, CD-2 said he was waiting on some money from someone in Barranquilla. **HERNANDEZ VILLAZON** replied that the attorney was not going to sit and wait. When CD-2 said he already paid seventy percent, **HERNANDEZ VILLAZON** responded that "all clients pay 100%" before they arrived.

g. On May 7, 2022, the CD-2 spoke with **HERNANDEZ VILLAZON**.

10

During the call, **HERNANDEZ VILLAZON** asked CD-2 to give a "car or something." CD-2 told **HERNANDEZ VILLAZON** not to worry. **HERNANDEZ VILLAZON** commented that CD-2 had a good team and thought it was "the best team" in the United States.

h. On June 4, 2022, in a call that traveled in interstate commerce, **HERNANDEZ VILLAZON** spoke with CD-2 and described that he (**HERNANDEZ VILLAZON**) was in New York. **HERNANDEZ VILLAZON** asked about the status of payments and claimed that CD-2 agreed to pay $1.2 million instead $1 million. CD-2 responded that the agreement was for $1 million and that he was not going to pay for representation of other codefendants. **HERNANDEZ VILLAZON** told CD-2 that he should pay because freedom does not have a price and that **HERNANDEZ VILLAZON** would guide CD-2 through his cooperation.

17.    Federal agents obtained communications between **HERNANDEZ VILLAZON** and family members of cooperating defendants as well as **HERNANDEZ VILLAZON** and coconspirators who transferred assets in Colombia in furtherance of **HERNANDEZ VILLAZON's** scheme. These communications included **HERNANDEZ VILLAZON** and his associates discussing cash and property turned over to them from the CDs and/or the CDs' family members. In one example on or about November 23, 2021, **HERNANDEZ VILLAZON** texted a coconspirator a sheet showing the amount of money received from various sources:

11



In other WhatsApp communications law enforcement obtained, **HERNANDEZ VILLAZON** spoke at length with a family member of CD-2 and a family member of CD-3. In those communications, the family members discuss sending payments on behalf of CD-2 and CD-3 as well as inquiring about the status of the CDs' cases.

18.    For example, from on or about May 6 to May 10, 2022, a family member of CD-2's was in contact via WhatsApp with **HERNANDEZ VILLAZON**

12

about transmitting money from Colombia to **HERNANDEZ VILLAZON** so that

**HERNANDEZ VILLAZON** could deposit the money into the commissary account

of CD-2 and a codefendant of CD-2's, both incarcerated in the Middle District of

Florida. On or about May 6, 2022, **HERNANDEZ VILLAZON** received an image

of a Western Union deposit for $201.26 sent from Colombia and addressed to "Jorge

Luis Hernandez Villazon, Orlando." On or about May 9, 2022, a family member of

CD-2's sent $800 from Riohacha, Colombia to **HERNANDEZ VILLAZON**. The

next day, **HERNANDEZ VILLAZON** sent confirmation that $200 for CD-2 and

$100 for one of CD-2's codefendants was deposited into their commissary accounts.

19.    On or about April 27, 2021, in an encrypted communication translated

from Spanish to English, **HERNANDEZ VILLAZON** told a family member of CD-

2 that CD-2 "has three years ahead. He'll get out after nine months more or less here

to the street." At the time of this representation, CD-2 was facing a minimum of ten-

years' imprisonment and a maximum term of life imprisonment. Moreover, at no

time was third-party cooperation approved for CD-2, yet **HERNANDEZ**

**VILLAZON** demanded—and received—money and things of value from CD-2 and

his family.

20.    On or about September 15, 2022, **HERNANDEZ VILLAZON** traveled

to the Pinellas County Jail with Individual 1. While there, **HERNANDEZ**

**VILLAZON** met with CD-2 and informed him that if CD-2 did not "pay up," his

family would have "issues" in Colombia.

13

21.    CD-3 was prosecuted in the Middle District of Florida. Prior to that, he agreed to pay the equivalent of about $700,000 to **HERNANDEZ VILLAZON** and Coconspirator 1, and offered vehicles, cash, and jewelry as forms of payment. CD-3 was promised a short prison sentence and that he would be living in an apartment instead of a jail upon arrival in the Middle District of Florida; in reality, CD-3 was facing a minimum ten-year sentence and a maximum sentence of life imprisonment. **HERNANDEZ VILLAZON** later offered third-party cooperation through drug seizures linked to organizations unknown to CD-3 and CD-3's family.

22.    **HERNANDEZ VILLAZON** knew that third-party cooperation was not approved for CD-3. In WhatsApp communications obtained in this investigation that he provided to a family member of CD-3's, **HERNANDEZ VILLAZON** told CD-3's attorney: "Tell [DEA Special Agent] that that person is a native that takes care of boats. He doesn't have any relationship with the [CD-3] family." CD-3's attorney later responded, "I can only say [the DEA Special Agent's] words: 'We need to identify who will be the person who will install the trackers – to know who that person is, and the relationship of the person with [CD-3's] family – and that person will need to meet with [the DEA Special Agent] or his agents, in order to provide the cooperation later on.'"

23.    Based on my training, experience, and knowledge of the investigation, I believe that **HERNANDEZ VILLAZON** was trying to present one of his informants for use in third-party cooperation, even though the informant was not associated

14

with CD-3's family. In response, CD-3's attorney told **HERNANDEZ VILLAZON** that the DEA needed to know the identity of the informant and his/her connection to CD-3's family before providing "cooperation later on." No third-party cooperation was ever approved on behalf of CD-3, yet **HERNANDEZ VILLAZON** demanded—and received—money and things of value from CD-3 and his family.

24.    Federal agents interviewed one of the coconspirators, Coconspirator 2. After being advised of his/her right to remain silent and have an attorney present, Coconspirator 2 made several admissions to agents. Coconspirator 2 admitted that **HERNANDEZ VILLAZON** used him/her to collect money to pay **HERNANDEZ VILLAZON's** "fees." Coconspirator 2 knew that **HERNANDEZ VILLAZON** promised significant sentence reductions to high-level traffickers that would never come to fruition. Coconspirator 2 further knew that **HERNANDEZ VILLAZON** promised CD-2 a short prison sentence and, in response, CD-2 turned over cash, vehicles, and property. Coconspirator 2 confirmed that CD-2 did not receive the benefits that **HERNANDEZ VILLAZON** promised.

25.    On or about July 17, 2024, **HERNANDEZ VILLAZON** contacted an FBI Special Agent stationed in San Juan, Puerto Rico. During their conversation, **HERNANDEZ VILLAZON** told the FBI Special Agent that he heard he was under investigation, that he knew CD-2 and CD-3 told law enforcement that they paid **HERNANDEZ VILLAZON** to help with their cases, and that he allegedly did not pay the defense lawyers. **HERNANDEZ VILLAZON** admitted that CD-2 and CD-3

15

paid him in the form of cash, vehicles, and houses, but that he (**HERNANDEZ VILLAZON**) kept 25% of the monies for his "services."

26. On or about July 1, 2024, **HERNANDEZ VILLAZON** deactivated the phone number he used to speak with the CDs and their families. The phone number had been activated on or about June 29, 2020. Based on my training, experience, and knowledge of the investigation, I believe that **HERNANDEZ VILLAZON** deactivated his cellphone number in response to this investigation.

27. In summary, **HERNANDEZ VILLAZON** solicited high-level traffickers to use his "services" with promises of substantial sentence reductions in exchange for payments in upwards of $1 million. **HERNANDEZ VILLAZON** did not provide the offered services. **HERNANDEZ VILLAZON** further devised a scheme to use his own network of informants to provide information to third-party cooperators without informing federal law enforcement, and knew that third-party cooperation was not approved in several cases yet continued to demand payments for services that were never rendered. Based on my training, experience, and knowledge of the investigation, I respectfully submit that there is probable cause to

believe that **JORGE LUIS HERNANDEZ VILLAZON**, knowingly and willfully

conspired with others known and unknown to commit wire fraud in violation of 18

U.S.C. § 1349.

Miosotis Ortiz-Rodriguez
Special Agent
Federal Bureau of Investigation

Affidavit submitted to me by reliable electronic means and attested to me as true and
accurate by telephone or other reliable electronic means consistent with Fed. R. Crim.
P. 4.1 and 41(d)(3) before me this 12 day of June 2025.

HONORABLE SEAN P. FLYNN
United States Magistrate Judge

17